# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY CRAIG HUCKABEE, | Case No. 1:09-cv-0749-DAD-BAM (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS THAT DEFENDANTS' MOTION FOR |
| v. | SUMMARY JUDGMENT BE GRANTED |
| MEDICAL STAFF AT CSATF, et al., | ECF No. 284 |
| Defendants. | **FOURTEEN (14) DAY DEADLINE** |

## I.     Background

Plaintiff Anthony Craig Huckabee ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action proceeds on Plaintiff's fifth amended complaint against Defendants Wu, Jimenez, and McGuinness for deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment. Specifically, Plaintiff's claims are against: (1) Defendant Wu for reducing the strength of Plaintiff's prescription eye drops on December 21, 2004; (2) Defendant Jimenez for assuring Plaintiff that he would personally handle Plaintiff's refill request for his eye drops on July 12, 14, and 18, 2005, but the medication was not refilled; and (3) Defendant McGuinness, who was aware of the delay in Plaintiff's glaucoma medication in May 2005 and February 2006. (ECF Nos. 272, 274.)

On April 19, 2019, Defendants Jimenez and Wu filed a motion for summary judgment on

1

the grounds that Defendants are entitled to judgment as a matter of law because there are no genuine issues of material fact, and Defendants are entitled to qualified immunity.[1] (ECF No. 284.) On May 6, 2019, Plaintiff filed his opposition to Defendants' motion for summary judgment. (ECF No. 285.) Defendants filed a reply on May 13, 2019. (ECF No. 286.) The motion is deemed submitted. Local Rule 230(l).

## II.      Legal Standard

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Id.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Id. (citing Celotex, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id.

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative

---

[1] Concurrent with this motion, Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment. ECF No. 284-7; See Woods v. Carey, 684 F.3d 934 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1988); Klingele v. Eikenberry, 849 F.2d 409, 411–12 (9th Cir. 1988).

2

evidence from which a jury could find in [its] favor." F.T.C. v. Stefanchik, 559 F.3d 924, 929

(9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not

suffice in this regard. Id. at 929; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its

opponent must do more than simply show that there is some metaphysical doubt as to the material

facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S.

at 587 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility

determinations or weigh conflicting evidence." Soremekun, 509 F.3d at 984. Instead, "[t]he

evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn

in [its] favor." Anderson, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the

nonmoving party must produce a factual predicate from which the inference may reasonably be

drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985),

aff'd, 810 F.2d 898 (9th Cir. 1987). Further, the Court may consider other materials in the record

not cited to by the parties, although it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v.

S.F. Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cty.,

Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In arriving at these findings and recommendations, the Court carefully reviewed and

considered all arguments, points and authorities, declarations, exhibits, statements of undisputed

facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of

reference to an argument, document, paper, or objection is not to be construed to the effect that

this Court did not consider the argument, document, paper, or objection. This Court thoroughly

reviewed and considered the evidence it deemed admissible, material, and appropriate.

### III.    Discussion

#### A.  Plaintiff's Procedural Objection

Plaintiff objects to Defendants' motion on the grounds that it is improper for Defendants

to raise the factual issues outside of a jury's consideration. Plaintiff argues that the motion

attempts to litigate the case without a jury and should be denied. (ECF No. 285.) For example, plaintiff argues that the motion "merely attempts to litigate the merits of claims without presentation to a jury. Questions of law are for the court to decide, questions of fact are left for the jury to weigh."

To the extent Plaintiff objects to the summary judgment motion procedure, that objection is overruled. A motion for summary judgment is specifically authorized by the Federal Rules of Civil Procedure. A motion for summary judgment provides a procedure for terminating without trial those actions in which "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P 56(a). Liberal pleading rules allow the assertion of claims and defenses that may have no evidentiary support. A motion for summary judgment "pierces" the pleadings and puts the opponent to the test of affirmatively coming forward with sufficient evidence for its claims or defenses to create a genuine issue for trial. Celotex Corp. v. Catrett, 477 US 317, 325, 106 S.Ct. 2548, 2554 (1986).

Plaintiff's opposition to Defendants' motion also consists of objections to Defendants' evidence. (ECF No. 285.) Plaintiff objects to the Defendants' undisputed facts at vague, conclusory and without foundation. Plaintiff objects to the scientific evidence as without foundation. Plaintiff argues that Defendants improperly attempt to shift the blame to others. Plaintiff's specific objections will be addressed below, as the Court considers Defendants' evidence.

### B. Undisputed Material Facts[2]

Facts Related to Defendant Wu

1. Dr. Wu examined Plaintiff on March 22, 2004, and noted his history of glaucoma and that he was taking eye drops. (ECF No. 284-2; Defendants' Separate Statement of Undisputed (SSUF) 1.)

2. Glaucoma is a group of eye diseases which result in damage to the optic nerve and

---

[2] These facts are taken from a combination of Defendants' Statement of Undisputed Material Facts (Doc. 284-2), Plaintiff's fifth amended complaint, and Plaintiff's objections to Defendant's summary judgment motion. However, the Court notes that neither the fifth amended complaint nor Plaintiff's objections is verified. ECF No. 193, 285, respectively. See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (verified pleadings and motions may be used as an opposing affidavit if it is based on pleader's personal knowledge of specific facts which are admissible in evidence). Unless otherwise indicated, disputed and immaterial facts are omitted from this statement.

eventual vision loss. It is commonly caused by increased pressure within the eye. This is often treated with the use of Timolol. Timolol is an eye drop that lowers the pressure inside the eye by decreasing the amount of fluid within the eye. Use of Timolol often will slow the progression of vision loss. The usual dosage of Timolol for the treatment of glaucoma is one drop of 0.25% solution in the affected eye twice a day. Adjustment of the dosage is common. If the clinical response to a 0.25% solution is not appropriate, the dosage may be changed to one drop of 0.5% solution in the affected eye twice a day.[3] (SSUF 2.)

3. Glaucoma is often asymptomatic for many years. As a result, approximately one-quarter of patients fail to adhere to the directed course of treatment and monitoring. This is even more commonly the case among male patients suffering from glaucoma. (SSUF 3.)

4. When treating a patient with glaucoma, the standard course of treatment is to monitor the condition, prescribe eye drops, and refer the patient to an ophthalmologist. (SSUF 4.)

5. During his examination of Plaintiff on March 22, 2004, Dr. Wu diagnosed him with glaucoma, refilled his prescription for Timolol eye drops, and referred him to an ophthalmologist.

6. Dr. Wu examined Plaintiff on April 14, 2004, noting that Plaintiff's eye was normal and ordering that the Timolol be refilled.[4]

7. Dr. Wu again examined Plaintiff on May 26, June 17, and July 7, 2004, for a variety of medical conditions and noted that Plaintiff was taking eye drops for his glaucoma. (SSUF 8.)

---

[3] Plaintiff objects to this scientific evidence as without sufficient foundation. The Court overrules the objection. Dr. Wu is a licensed physician, practicing since 1972, in the area of family medicine and general practice. (ECF No. 284-3.) Dr. Wu testifies that he has treats glaucoma with Timolol and treated Plaintiff with this medication. Fed.R.Evid. 703 (An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.). As Dr. Wu is relying upon his more than thirty years of experience in medical practice, at the time of Plaintiff's treatment, the evidence has foundational support.

[4] Plaintiff objects to his condition being described as "normal." The Court overrules the objection. The inference from the word "normal" is that Plaintiff's condition had not deteriorated and did not require any other kind of medical treatment.

8. Dr. Wu again examined Plaintiff on August 9, 2004.

9. During the examination of Plaintiff on August 9, 2004, Dr. Wu noted that Plaintiff had refused his appointment with the ophthalmologist, which was supposed to have taken place on July 2, 2004.

10. On August 9, 2004, Dr. Wu refilled Plaintiff's Timolol and advised him to schedule an appointment to be seen by the optometrist. (SSUF 10.)

11. Plaintiff was seen by an optometrist on August 25, 2004. (SSUF 11.)

12. Dr. Wu examined Plaintiff again on September 3, 2004, noted the recent examination by the optometrist, and ordered that Plaintiff's Timolol be refilled. (SSUF 12.)

13. On December 21, 2004, Dr. Wu was provided with a physician's order renewing Plaintiff's prescription for Timolol. This routine order was among many that day that were written by someone else on the medical staff for Dr. Wu's approval. The order stated that Plaintiff's prescription for Timolol was to be 0.25% solution, one drop, twice a day. (SSUF 13.)

14. In 2004, inmate medical records at the California Substance Abuse Treatment Facility (CSATF) were not computerized and Dr. Wu did not have access to Plaintiff's medical chart when he reviewed the order of December 21, 2004. Therefore, Dr. Wu was not aware that it reduced Plaintiff's Timolol from a 0.5% solution to a 0.25% solution. (SSUF 14.)

15. A prescription of a 0.25% solution of Timolol was a standard dosage for the treatment of glaucoma and is effective in slowing the progression of the disease. Therefore, Dr. Wu saw nothing inappropriate about the order and signed it. (SSUF 15.)

16. Dr. Wu examined Plaintiff again on March 9, 2005, noting that his eyes were normal. He renewed Plaintiff's prescription for Timolol and referred him to the ophthalmologist. (SSUF 16.)

17. Dr. Wu examined Plaintiff again on April 15, 2005, noting that Plaintiff's eyes were normal and that he should still be seen by the ophthalmologist. (SSUF 17.)

18. Dr. Wu examined Plaintiff again on April 29, 2005, for medical conditions unrelated to his glaucoma and has no recollection of being involved in Plaintiff's

6

medical care after this date.

19. During Dr. Wu's involvement in Plaintiff's medical care, Plaintiff's clinical response to the use of Timolol was appropriate and his eye condition remained normal.

20. Plaintiff admits that his current physician and his outside eye professionals have never told him that they would have provided different treatment for his glaucoma than he received from Dr. Wu.[5]

21. Plaintiff's prescription for a 0.25% solution of Timolol was then refilled by other doctors on the following dates: August 12, 2005; November 30, 2005; December 7, 2005; and March 30, 2006.

22. Plaintiff was seen by another doctor on May 25, 2006, and complained of a decrease in vision. He was referred to the ophthalmologist. (SSUF 22.)

23. On July 21, 2006, Plaintiff's prescription for a 0.25% solution of Timolol was again renewed by another doctor.

24. On September 15, 2006, Plaintiff was seen by an ophthalmologist and his prescription for Timolol was increased to a 0.5% solution.

Facts Related to Defendant Jimenez

25. As a Medical Technical Assistant (MTA) at CSATF, one of Jimenez's chief responsibilities was to work the window at the medical clinic. Inmates would come to the window in order to have a wide-range of medical needs addressed.

26. In his work as an MTA, Jimenez was typically addressing the medical needs of inmates on two different prison yards. There were approximately 1000 total inmates located on these two yards. Approximately 75% of the inmates would have prescriptions for medications at any given time. On a typical day, Jimenez usually interacted with approximately 100 inmates at the window of the medical

---

[5] Plaintiff objects that he did not "admit" this statement. His deposition testimony supports the undisputed fact. See Doc. 284-6 Exh. A. Nonetheless, the Court does not find whether other doctors would have provided the same treatment or would have provided different treatment is not a disputed material fact. The issue before this Court is Defendant Wu's conduct on December 21, 2004.

clinic. (SSUF 26.)

27. One of the most common issues an inmate would wish to discuss with the MTA at the medical clinic window was a need to have his prescribed medications refilled. This would happen multiple times each day.

28. At CSATF in 2005, medical staff did not have access to computerized medical records at the medical clinic window. Therefore, when an inmate at the window stated that a prescription needed to be re-filled, it was necessary to call the pharmacy and request that they fax a patient profile regarding that inmate to the medical clinic. That patient profile would list what medications were prescribed for that inmate and whether they needed being refilled. The patient profile would then be provided to a doctor for a determination of whether or not to refill the prescription.

29. The doctor receiving the patient profile may or may not have been the patient's primary care physician. Due to physician shortages at CSATF in 2005, it may not have been possible for a doctor to immediately review a patient profile and there may have been a resulting delay in refilling a prescription. This was out of Jimenez's hands as he had no authority over hiring or staffing decisions.

30. When a doctor received the patient profile, he or she would determine whether the prescription should be refilled, whether the dosage should be the same, whether an alternative medication should be prescribed, or whether the inmate should first be examined by a doctor before deciding of whether to refill the prescription. These were decisions that could not be made by an MTA. As an MTA, Jimenez did not have authority to prescribe medications or refill existing prescriptions.

31. When an inmate approached Jimenez at the window of the medical clinic at CSATF and indicated that a prescription needed to be refilled, it was Jimenez's custom and habit to inform him that the issue would be addressed by medical staff. Jimenez would then request that the pharmacy fax a patient profile for that inmate to the medical clinic and Jimenez would then provide that to a doctor.

8

32. Jimenez has no recollection of interacting with Plaintiff in 2005. If Plaintiff had

    told Jimenez that he needed to have his prescription for eye drops refilled, Jimenez

    would have acted consistently with his custom and habit in such situation. Jimenez

    would have informed Plaintiff that his refill request would be addressed by

    medical staff. Jimenez would have then contacted the pharmacy and requested that

    they fax a copy of Plaintiff's patient profile to the medical clinic. Jimenez[6] would

    have then provided that patient profile to a doctor to consider whether Plaintiff's

    prescription for eye drops should be refilled.

33. It would have been beyond Jimenez's authority to actually refill Plaintiff's

    prescription.

34. Plaintiff admits that he does not know what Jimenez could have done to provide

    him with eye drops. (SSUF 34.)

**C. Deliberate Indifference to Serious Medical Needs**

       1.      Standard for Deliberate Indifference to Serious Medical Needs

    While the Eighth Amendment of the United States Constitution entitles Plaintiff to

medical care, the Eighth Amendment is violated only when a prison official acts with deliberate

indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th

Cir. 2012), overruled in part on other grounds by Peralta v. Dillard, 744 F.3d 1076, 1082–83 (9th

Cir. 2014); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  The two-part test for deliberate

indifference requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that failure

to treat a prisoner's condition could result in further significant injury or the 'unnecessary and

wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately

indifferent."  Jett, 439 F.3d at 1096 (citation omitted).

    A defendant does not act in a deliberately indifferent manner unless the defendant "knows

---

[6] Plaintiff objects to Defendant Jimenez providing evidence outside of the presence of the jury. (ECF No. 285.)  As explained above, Plaintiff's objection is overruled as the purpose of Rule 56 is to determine whether disputed issues of fact exist for jury determination.  Plaintiff does not provide evidence to dispute the facts presented by Defendant Jimenez.  Instead, he merely objects to the procedure.  The procedure employed by Defendants is specifically prescribed by Rule 56.

of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Snow, 681 F.3d at 985. Deliberate indifference may be shown by the denial, delay, or intentional interference with medical treatment or by the way in which medical care is provided. Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988). "Deliberate indifference is a high legal standard," Simmons v. Navajo Cty., Ariz., 609 F.3d 1011, 1019 (9th Cir. 2010); Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm. Jett, 439 F.3d at 1096. "Mere delay of medical treatment, without more, is insufficient to state a claim of deliberate medical indifference." Robinson v. Catlett, 725 F.Supp.2d 1203, 1208 (S.D. Cal. July 19, 2012) (quoting Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.1985)). To state a claim for deliberate indifference arising from a delay in treatment, a prisoner must allege that the delay was harmful, although an allegation of substantial harm is not required. McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir.1991), overruled on other grounds by, WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir.1997).

In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Labs., 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105–06).) "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106; see also Anderson v. Cty. of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate

10

1 indifference." Snow, 681 F.3d at 987. "To show deliberate indifference, the plaintiff must show

2 that the course of treatment the doctors chose was medically unacceptable under the

3 circumstances and that the defendants chose this course in conscious disregard of an excessive

4 risk to plaintiff's health." Id.

5     2.   Serious Medical Need

6     Defendants contend that Plaintiff did not have a serious need. Defendants contend that the

7 glaucoma condition was not serious because it was under control with medication and

8 examinations of his eyes were normal.

9     It is undisputed that Plaintiff was diagnosed with glaucoma. "Examples of serious medical

10 needs include [t]he existence of an injury that a reasonable doctor or patient would find important

11 and worthy of comment or treatment; the presence of a medical condition that significantly

12 affects an individual's daily activities; or the existence of chronic and substantial pain." Lopez v.

13 Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (alteration in original) (citation and internal quotation

14 marks omitted). According to Defendant Wu, glaucoma is a group of eye diseases which result in

15 damage to the optic nerve and eventual vision loss. (SSUF 2.) The evidence shows that Plaintiff

16 saw Defendant Wu with concerns about glaucoma. Thus, viewing the evidence in the light most

17 favorable to Plaintiff and drawing all reasonable inferences in his favor, a reasonable juror could

18 find that glaucoma is a serious medical need.

19     3.   Defendant Wu's Reduction of Medication Strength was not Deliberate Indifference

20     Plaintiff has failed to raise a disputed issue of material fact that Dr. Wu was aware of a

21 substantial risk of serious harm from the reduction of the Timolol medication from .5% to .25%

22 for Plaintiff's eye and that Dr. Wu drew that inference. The undisputed evidence is that

23 Defendant Wu did not reduce the medication strength. Defendant Wu was following another's

24 physician's order renewing Plaintiff's Timolol prescription for 0.25%. (SSUF 13.) It is

25 undisputed that the physician's order stated Plaintiff's prescription for Timolol was to be 0.25%

26 solution, one drop, twice a day. Id. It is also undisputed that Defendant Wu thought the

27 appropriate dosage was, in fact, 0.25% of Timolol because that was the standard dosage of

28 treatment for glaucoma and is effective in slowing the progression of the disease. (SSUF 14.)

1    Whether a prison official was deliberately indifferent is subjective. The prison official must not

2    only "be aware of facts from which the inference could be drawn that a substantial risk of serious

3    harm exists," but that person "must also draw the inference." Farmer v. Brennan, 511 U.S. 825,

4    837 (1994). There is no disputed issue of fact of a substantial risk of harm from the reduction of

5    the Timolol because the only evidence before the Court is that 0.25% is appropriate dosage for

6    treatment for glaucoma.

7         Indeed, Plaintiff does not present evidence that the reduction in strength of Timolol was

8    deliberately indifferent.  Plaintiff's operative fifth amended complaint, which is unverified, states

9    that following the reduction in strength from 0.5% to 0.25%, the pressure in plaintiff's "eyes had

10   not dropped to a safe level to justify a change in Plaintiff's medication."  (ECF No. 193, p.10 of

11   37.)  However, Plaintiff has not presented any competent evidence that the pressure in his eyes

12   was not at safe level. Plaintiff speculates that the reduction of strength of the medication made his

13   eye pressure unsafe, but Plaintiff is not a medical practitioner and cannot opine as to a safe level

14   of pressure in his eyes. The undisputed evidence is that 0.25% medication was the standard

15   prescriptive strength.

16        Further, Defendant Wu's failure to note that the 0.25% was actually a reduction in the

17   strength from .5% of medication is not deliberate indifference.  A difference of opinion between a

18   medical practitioner and the prisoner—or between medical professionals—concerning what

19   medical care is appropriate does not amount to deliberate indifference." Snow, 681 F.3d at 987.

20   Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

21   Broughton v. Cutter Labs., 622 F.2d 458, 460 (9th Cir. 1980).  Even gross negligence is

22   insufficient to establish deliberate indifference to serious medical needs.  See Wood v.

23   Housewright, 900 F.2d at 1334.

24        Plaintiff has failed to raise any issue of fact that he was harmed from the reduction of

25   medication strength on December 21, 2004.  Plaintiff alleges that he lost his eyesight on

26   September 15, 2006 (ECF No. 193, par. 4), nearly two years following the reduction of Timolol

27   by Defendant Wu.  Plaintiff speculates that he lost his eyesight as a result of the reduction in

28   Timolol strength by Defendant Wu, and all subsequent physicians who consistently prescribed

12

1    0.25% Timolol in 2005 and 2006.  However, Plaintiff is not a medical expert and cannot state the

2    cause of the loss of eyesight or which physician's conduct (if any) was the cause.  Fed.R.Evid.

3    702, 703.

4         Plaintiff has failed to raise a disputed issue of material fact that Defendant Wu was aware

5    of a substantial risk of serious harm and that he drew that inference by reducing the Timolol

6    medication strength to 0.25% on December 21, 2004.  The undisputed evidence is that Defendant

7    Wu was signing off on another doctor's dosage strength and that Defendant Wu believed the

8    dosage strength was appropriate for ongoing treatment.  Plaintiff appears to attribute to Dr. Wu all

9    subsequent physicians' prescriptions of the "wrong" Timolol strength. (ECF No. 193 p. 10 of 37.)

10   However, there is no evidence that Defendant Wu was involved in any subsequent prescription of

11   Timolol.  Thus, this case revolves solely on whether the reduction in strength of Timolol by

12   Defendant Wu on December 21, 2004 was deliberately indifferent and caused harm. (SSUF 21.)

13   See Snow v. McDaniel, 681 F.3d at 987 ("A difference of opinion between a physician and the

14   prisoner - or between medical professionals - concerning what medical care is appropriate does

15   not amount to deliberate indifference.")  Since Defendant Wu was signing off on another doctor's

16   dosage strength and that Defendant Wu believed the dosage strength was appropriate for ongoing

17   treatment, the motion should be granted as to Plaintiff's claim for deliberate indifference to

18   medical care.

19        4.  Defendant Jimenez was not Deliberately Indifferent

20        Plaintiff claims that Defendant Jimenez assured Plaintiff that Jimenez would personally

21   handle Plaintiff's refill request for his eye drops on July 12, 14, and 18, 2005, but the medication

22   was not refilled.  Plaintiff's only opposition to Defendant Jimenez's motion is Plaintiff's

23   objection to the procedure of summarily adjudicating his claims because these are "issues to be

24   litigated at trial, not motion for summary [judgment], to avoid trial."  (ECF No. 285 p. 3 of 5.)  As

25   discussed above, the motion for summary judgment is an appropriate procedure under the Federal

26   Rule of Civil Procedure.

27        Plaintiff has not raised a disputed issue of material fact that Defendant Jimenez was

28   deliberately indifferent to Plaintiff's medical need.  Jimenez states that as a Medical Technical

1    Assistant, he did not have the authority to refill a prescription.  (SSUF 30.)  Jimenez's duties,

2    when presented with a request for a prescription refill, was to call the pharmacy and request a

3    patient profile.  (SSUF 28.)  The patient profile listed the prescriptions and whether a refill was

4    necessary.  If a refill was necessary, the profile was provided to the doctor at the medical clinic

5    who determined whether or not to refill the prescription.  There is no evidence that Jimenez had

6    the authority or ability to refill any prescription requested by inmates.  As a Medical Technical

7    Assistant, Jimenez states he did not have authority to prescribe medications or refill existing

8    prescriptions.  (SUFF 30.)  Plaintiff has not presented any evidence to dispute that Jimenez lacked

9    authority to prescribe or refill prescriptions. The undisputed evidence is that Jimenez's authority

10   was limited to requesting the patient profile and providing that information to the doctor to

11   determine whether to prescription should be refilled.

12         Plaintiff objects to Defendant Jimenez's evidence relying on Jimenez's custom and

13   practice in dealing with inmates during the scope of his employment.  Defendant Jimenez states

14   that, because he has no specific recollection of any interaction with Plaintiff, that it was Jimenez's

15   custom and habit to inform inmates that the issue would be addressed by medical staff.  (SSUF

16   31, 32.) The Court overrules plaintiff's objection to the custom and practice evidence.  Evidence

17   of a person's habit or the routine practice or custom of a business is admissible to prove conduct

18   on a specific occasion in conformity with that habit, practice or custom. Fed.R.Evid. 406.

19         **D.  Qualified Immunity**

20         Defendants argue even if they committed constitutional violations, they are entitled to

21   qualified immunity. The defense of qualified immunity protects "government officials...from

22   liability for civil damages insofar as their conduct does not violate clearly established statutory or

23   constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457

24   U.S. 800, 818 (1982). A court considering a claim of qualified immunity must determine whether

25   the plaintiff has alleged the deprivation of an actual constitutional right and whether the right was

26   clearly established, such that it would be clear to a reasonable officer that his conduct was

27   unlawful in the situation he confronted. Pearson v. Callahan, 555 U.S. 223, 236 (2009); Saucier v.

28   Katz, 533 U.S. 194, 201 (2001). The evidence must be viewed in the light most favorable to the

14

1   non-moving party. <u>Tolan v. Cotton</u>, 134 S.Ct. 1861, 1866 (2014).

2          Because this Court finds Defendants Wu and Jimenez are entitled to summary judgment

3   on the merits of the Eighth Amendment claim, there is no reason to reach the qualified immunity

4   issue in this case. Thus, this is not a case where qualified immunity need be determined.

5   **IV.    <u>Conclusion and Recommendation</u>**

6          Based on the foregoing, IT IS HEREBY RECOMMENDED that:

7          1.  Defendants Wu and Jimenez's motion for summary judgment, (ECF No. 284), be

8              GRANTED, and

9          2.  Judgment be entered in favor of Defendants and against Plaintiff.

10         These Findings and Recommendations will be submitted to the United States District

11  Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within

12  fourteen (14) days after being served with these Findings and Recommendations, the parties may

13  file written objections with the court. The document should be captioned "Objections to

14  Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file

15  objections within the specified time may result in the waiver of the "right to challenge the

16  magistrate's factual findings" on appeal. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838–39 (9th Cir.

17  2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

18
19  IT IS SO ORDERED.

20     Dated:   **February 4, 2020**            /s/ *Barbara A. McAuliffe*

21                                          UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28